Robert PENROD, et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

International Brotherhood of Teamsters, Local 166, Intervenor.

No. 99–1121.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 7, 2000.

Decided Feb. 22, 2000.

Glenn M. Taubman argued the cause and filed the briefs for petitioners.

Jill A. Griffin, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Peter D. Winkler, Supervisory Attorney. John D. Burgoyne, Deputy Associate General Counsel, entered an appearance.

James B. Coppess argued the cause for intervenor. With him on the brief was Gary S. Witlen.

Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Concurring opinion filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

This petition to review a decision of the National Labor Relations Board requires us to consider what information a union's duty of fair representation requires it to give employees about their right under *Communications Workers of America v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), to pay only that portion of union dues attributable to "collective bargaining, contract administration, and grievance adjustment." *Id.* at 745, 108 S.Ct. 2641. The Board held that unions have no obligation to tell employees who have not yet exercised their *Beck* rights what percentage of dues are spent on nonrepresentational activities. The Board also ruled that the union in this case had given employees who had chosen to exercise their *Beck* rights sufficient information to satisfy its duty of fair representation. Finding a portion of the Board's decision unsupported by reasoned decisionmaking and the remainder in conflict with Supreme Court and circuit precedent, we grant the petition for review.

I

Section 8(a)(3) of the National Labor Relations Act gives unions the right to negotiate union security provisions allowing them to collect dues from all members of a bargaining unit, including those who decline full union membership. 29 U.S.C. § 158(a)(3); *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 119 S.Ct. 292, 296, 142 L.Ed.2d 242 (1998). Employees who choose not to become full union members are called "financial core" payors. *See NLRB v. General Motors Corp.*, 373 U.S. 734, 742, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). In *Beck*, the Supreme Court held that section 8(a)(3) does not obligate employees "to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment." 487 U.S. at 745, 108 S.Ct. 2641. Unlike full union members and financial core payors, employees who object to funding nonrepresentational activities, called "*Beck* objectors," pay reduced dues. *Beck* objectors are also known as "potential challengers" because they have a right to challenge the union's calculation of the reduced dues; in response to such challenges, the union bears the burden of justifying its calculation. *See California Saw & Knife Works*, 320 NLRB 224, 240, 1995 WL 791959 (1995).

Petitioners Robert Penrod, Nadine Penrod, and Clement Wierzbicki, long-time employees of DynCorp Support Services Operations, resigned from their union, International Brotherhood of Teamsters, Local 166, and exercised their *Beck* rights. Petitioner John Burnham never became a full member of the union, instead informing Local 166 shortly after being hired that he wished to be a financial core payor.

Having received no information from Local 166 about their *Beck* rights, all four petitioners filed unfair labor practice charges against the union. Pursuant to an agreement settling these charges, Local 166 promised to give all new employees and financial core payors initial *Beck* notices outlining their *Beck* rights and describing how to exercise them. The union also sent letters to the *Beck* objectors informing them that they must pay 93.6 percent of union dues and describing procedures for challenging that calculation. Attached was a letter from an independent auditor confirming the accuracy of the reduced fee calculation. The auditor in turn attached a handwritten worksheet listing nineteen categories of expenditures, such as "salaries," "benefits paid," "legal expenses," and "auto expenses." For each expenditure category, the auditor identified the amount and percentage "chargeable" and "nonchargeable" to *Beck* objectors. The worksheet referred to a "breakdown" and to "schedules," but they were not attached. The auditor's worksheet is attached to this opinion as Appendix A.

Complaining that the information furnished by Local 166 and its auditor was inadequate, petitioners renewed their unfair labor practice charges. In response, the NLRB's General Counsel filed a formal complaint charging Local 166 with failing to include in the initial *Beck* notice the percentage by which dues would be reduced for new employees and financial core payors who exercise their *Beck* rights. The General Counsel also charged that the financial information given to *Beck* objectors was "too vague to permit each of these employees to decide whether to challenge any of the expenditures listed in the Statement of Expenses."

The Board rejected the General Counsel's charges. *International Bhd. of Teamsters, Local 166, AFL–CIO*, 327 NLRB No. 176, 1999 WL 170689 (1999). Although agreeing that the duty of fair representation required Local 166 to provide initial *Beck* notices to new employees and financial core payors, the Board determined that the union had not violated its duty by failing to include the percentage by which dues would be reduced. Citing the time and expense needed to make such calculations, and explaining that the duty of fair representation affords unions a

"wide range of reasonableness," the Board concluded that the decision to furnish the percentage was a "judgment call" within the union's discretion. *Id.*, slip op. at 3. With respect to employees who had exercised their *Beck* rights, the Board found that the auditor's information was sufficient for them to determine whether to challenge the reduced fee calculation. *Id.*, slip op. at 4–5.

Petitioners challenge the Board's decision on three grounds. The first two concern the information given *Beck* objectors. The one-page handwritten list of expenditures, they say, neither explained nor justified the union's determination that *Beck* objectors would be required to pay 93.6 percent of dues. Their second challenge focuses on the approximately twenty-five percent of total expenditures that Local 166 paid to its affiliates. *See* Appendix A. The third challenge relates to new employees and financial core payors; according to petitioners, such employees are entitled to know the precise amount by which their dues would be reduced were they to exercise their *Beck* rights. Local 166, defending the Board's conclusion that it satisfied its duty of fair representation, has intervened.

## II

■ Grounded in section 9(a) of the NLRA, 29 U.S.C. § 159(a), the judicially created duty of fair representation reflects the principle that a union's status as exclusive representative of employees in a bargaining unit "includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Unions breach their duty of fair representation when their conduct toward members of a bargaining unit is "arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. 903.

The Supreme Court fleshed out the duty of fair representation in the *Beck* context in *Chicago Teachers Union, Local No. 1, AFT, AFL–CIO v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). In that case, the Court established procedures that unions must follow to protect objectors and described the financial information that unions must give to potential objectors. "Basic considerations of fairness, as well as concern for the First Amendment rights at stake," the Court held, "dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee." *Id.* at 306, 106 S.Ct. 1066. While *Hudson* involved public employees and arose under the First Amendment, this circuit has applied its requirements to nonpublic unions such as Local 166. *See, e.g., Abrams v. Communications Workers of America,* 59 F.3d 1373, 1379 n. 7 (D.C.Cir.1995). With this framework in mind, we turn to petitioners' three challenges.

*General Disclosure to Beck Objectors*

■ With respect to their first claim— that the list of nineteen expenditure categories was insufficient to allow them to determine whether to challenge the reduced fee calculation—petitioners complain that the single sheet "contains no notes or other written explanation concerning *how* that union's overall 93.6% chargeable, 6.4% nonchargeable calculation was made." That lack of explanation, petitioners contend, was compounded by the "vague and unexplained" line items and the absence of referenced schedules and breakdowns.

The Board ruled that the *Beck* objectors had no need for schedules, breakdowns, or better-defined categories of expenses to determine whether to challenge the reduced dues calculation. Addressing the *Beck* objectors' most fundamental argument—that the single page of financial information failed to explain *how* the union arrived at its 93.6 percent chargeable figure—the Board relied entirely on a decision of the Seventh Circuit, *Gilpin v.*

*American Fed'n of State, County, and Mun. Employees, AFL–CIO*, 875 F.2d 1310, 1316 (7th Cir.1989): "As the Seventh Circuit Court of Appeals has remarked in response to the same kind of argument, 'if it did [include the disclosure petitioners requested], the notice would be as long and complicated as an SEC prospectus.' The court discerned no reason for imposing such a requirement, and neither do we." 327 NLRB No. 176, slip. op. at 5 (citing *Gilpin*, 875 F.2d at 1316).

The union's disclosure in *Gilpin* was more extensive than Local 166's. In addition to listing thirty-five different types of expenditures (comparable to the nineteen categories provided by Local 166), the notice in *Gilpin* identified thirty-five specific union activities, indicating for each whether the union considered it "wholly chargeable," "wholly unchargeable," or "mixed." *Gilpin*, 875 F.2d at 1316. For example, the notice identified publishing a union newsletter as "mixed" and adjusting grievances as "wholly chargeable." *Id.* For a payment of $1.50, each employee could also obtain an arbitrator's "detailed ruling" said to sustain the union's expense allocations. *Id.* According to the Seventh Circuit, this information "should be enough . . . to allow the employee to decide whether there is any reason to mount a challenge." *Id.*

By comparison, the *Beck* objectors in this case were given only general categories of expenditures. *See* Appendix A. To be sure, two of these categories—"contributions" and "organizing"—were quite specific, but both were totally "noncharge-able." The union offered no separate list of activities and provided no opportunity to obtain a detailed explanation of how the union calculated the allocation of expenses. In addition, the *Beck* objectors never received the "schedules" and "breakdown" said to be attached to the auditor's report.

The information provided in *Gilpin*, as the Seventh Circuit found, gave objectors a basis for objecting to the union's calculation of reduced dues. For example, they could have reviewed the newsletter and

made their own judgment about whether to challenge the union's determination that newsletter costs were partially chargeable. Could *Beck* objectors in this case have made a similar judgment about the general categories of expenditures supplied by the auditor? For example, how could they have evaluated the union's determination that "salaries" were partially chargeable to *Beck* objectors in view of the fact that the only other information they were given about salaries was the gross amount? Instead of answering this question, the Board simply cited *Gilpin* as though the case dealt with the same type of disclosure. Because it did not, we think the Board's decision reflects a classic case of lack of reasoned decisionmaking. *See Macmillan Publishing Co. v. NLRB*, 194 F.3d 165, 168 (D.C.Cir.1999) (The Regional Director's "rationale was the antithesis of reasoned decisionmaking, and as such was arbitrary and capricious.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

*Information about Payments to Affiliates*

■ Petitioners' second complaint about the union's financial disclosure focuses on the information about Local 166's payments to affiliated unions. Representing almost twenty-five percent of the union's total expenditures, payments to affiliates were 90.8 percent chargeable to *Beck* objectors. *See* Appendix A. In addition to arguing that Local 166 should have explained this calculation, petitioners claim that they are entitled to know which affiliates received funds and how those affiliates used those funds. They rely on the following language from *Hudson*: "[E]ither a showing that none of [the money paid to affiliates] was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used was surely required." 475 U.S. at 307 n. 18, 106 S.Ct. 1066.

In concluding that Local 166's disclosure was adequate, the Board distinguished

*Hudson*: "In that case, the union paid more than half its income to affiliated organizations, but informed nonmembers only that they were required to pay 95 percent of full dues. It did not inform them of the basis on which it was charging them that amount or, apparently, anything regarding how the amounts transferred to affiliates were spent or what percentages were chargeable and nonchargeable." 327 NLRB No. 176, slip. op. at 5.

The Board's basis for distinguishing *Hudson* is curious. To begin with, two of the deficiencies in the *Hudson* notice that the Board said made *Hudson* different from this case were also deficiencies in Local 166's disclosure. The union in *Hudson,* the Board said, "did not inform [the employees] of the basis on which it was charging them that amount or, apparently, anything regarding how the amounts transferred to affiliates were spent." *Id.* Yet this is precisely the information that Local 166 failed to provide and that petitioners seek in this case.

So the Board's conclusion that *Hudson* differs from this case boils down to two distinctions. In *Hudson,* the union spent fifty percent of its budget on affiliates; here, it spent twenty-five percent. In *Hudson,* the union failed to identify the percentage of payments to affiliates chargeable to *Beck* objectors; here, the union said such payments were ninety percent chargeable. Nothing in *Hudson* suggests that the level of required disclosure turns on such factors. *Hudson*'s directive is quite simple: unless a union demonstrates that "none of [the amount paid to affiliates] was used to subsidize activities for which nonmembers may not be charged," then "an explanation of the share that was so used [is] surely required." 475 U.S. at 307 n. 18, 106 S.Ct. 1066. Because Local 166 disclosed that over ninety percent of the amount paid to its affiliates was chargeable to *Beck* objectors, *Hudson* requires that the union explain how its affiliates used the money.

*Initial Notice to New Employees and Financial Core Payors*

■ This brings us to petitioners' challenge to the Board's ruling that the initial *Beck* notice given to new employees and financial core payors need not identify the percentage reduction in dues that would result from a *Beck* objection. Explaining its decision, the Board observed that calculating the reduced fee "can be an expensive and timeconsuming undertaking" and emphasized the "wide range of reasonableness" afforded unions in serving the employees they represent. 327 NLRB No. 176, slip op. at 3. We need not consider whether to defer to such reasoning, for this issue is squarely controlled by *Hudson* as interpreted by this court in *Abrams.*

In *Hudson,* the Supreme Court held that "[b]asic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee." 475 U.S. at 306, 106 S.Ct. 1066. *Abrams* expressly applies *Hudson*'s requirements to new employees and financial core payors. 59 F.3d at 1379. Since *Hudson* requires that potential objectors be told the percentage of union dues chargeable to them—for how else could they "gauge the propriety of the union's fee"— and since *Abrams* applies *Hudson* to new employees and financial core payors, they too must be told the percentage of union dues that would be chargeable were they to become *Beck* objectors.

The Board and Local 166 nevertheless insist that *Hudson* applies only to employees who have elected to exercise their *Beck* rights, not to new employees and financial core payors. But *Abrams* could not have been clearer. Like the Board and Local 166, the dissent in *Abrams* argued that *Hudson*'s requirements do not apply to new employees and financial core payors. *Abrams,* 59 F.3d at 1383–84 (Tatel, J., concurring in part and dissenting in part). *Abrams* ruled to the contrary: "The dis-

sent takes issue with our interpretation of *Hudson* but the quoted language makes clear that *potential* objectors must be given adequate notice. Although the Supreme Court addressed the issue in the context of 'information about the basis for the proportionate share' of financial core expenses, the same 'basic considerations of fairness' necessarily extend to a union's notice to workers of their *right* to object to payment of any expenses beyond the financial core." *Abrams*, 59 F.3d at 1379 n. 6 (internal citation omitted).

■ The Board and Local 166 point out that *Abrams* concerned the wording of the initial *Beck* notice, not whether the union must disclose the percentage reduction. In order to conclude that the wording was inadequate, however, *Abrams* had to hold that *Hudson* applies to new employees and financial core payors, and *Hudson* carries with it the requirement that unions give employees "sufficient information to gauge the propriety of the union's fee"—*i.e.*, the percentage reduction (*see supra* at 47). 475 U.S. at 306, 106 S.Ct. 1066. We recognize that this means that new employees and financial core payors must be given the same information as *Beck* objectors, but *Abrams* is the law of this circuit.

■ Petitioners challenge the initial *Beck* notice for a second reason. They contend that the initial notice must not only identify the amount of the reduced fee but also explain the method used to calculate the fee. According to the Board, petitioners failed to raise this issue before the Board and so cannot raise it for the first time on appeal. We agree with the Board.

The two record excerpts petitioners point to—a paragraph in the petitioners' final unfair labor practice charge and three paragraphs in the General Counsel's fourth amended complaint—cannot fairly be read to raise the issue. Both refer only to the financial information designed for *Beck* objectors, not to the initial *Beck* notice given to new employees and financial core payors. Rejecting petitioners' contention that the method of calculation is "implicit" in the issue of disclosure of the fee itself, we conclude that we may not consider petitioners' claim that the initial *Beck* notice must include an explanation of the method used to calculate the fee. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 939 (D.C.Cir. 1998).

III

The petition for review is granted, and this case is remanded to the Board for proceedings consistent with this opinion.

*So ordered.*

Local 166   1991
Statement of Expenses

| Code | Item | Total | Charge | Non Charge | % Charge | % Non Chg |
|---|---|---|---|---|---|---|
| 6 | Salaries - Per hours Summary | 709,920.93 | 668,744.59 | 35,176.34 | 95.0028 | 4.9972 |
| 2 | Expense Allowance | 9,820- | 8,679.08 | 1,140.92 | 95.0028 | 4.9972 |
| 3 | Per Capita - Per Breakdown | 424,012.04 | 385,158.64 | 38,853.81 | 90.8366 | 9.1634 |
| H | Contributions | 1,149.44 | - | 1,149.44 | - | 100 |
| 2/8 | Benefits Paid (Schedule 1.) | 222,127.14 | 212,204.73 | 9,922.41 | 95.5139 | 4.4861 |
| 9 | Refund Dues | 10,935.53 | 10,935.53 | - | 100- | - |
| 7 | Refund Init & Reinit | 1,453.46 | 1,453.46 | - | 100 | - |
| 8 | Other Refunds | 1,163.83 | 1,163.83 | - | 100 | - |
| 9 | Office Exp (Schedule 2.) | 99,769.38 | 96,171.85 | 3,597.53 | 96.3934 | 3.6066 |
| 9 | Legal Exp | 12,635.46 | 10,740.14 | 1,895.22 | 85% | 15% |
| 8 | Arbitrator Fees | 12,478.50 | 12,478.50 | - | 100- | - |
| 8 | Other Professional Fees | 7,675- | 7,675- | - | 100 | - |
| 8 | Taxes (Per Audit) | 61,675.00 | 61,675- | - | 100 | - |
| 4 | Organizing Exp | 2,163.62 | - | 2,163.62 | - | - |
| 2 | Mtg & Committee Exp | 10,474.87 | 9,951.42 | 523.45 | 95.0028 | 4.9972 |
| 8 | Strike Exp | - | - | - | - | - |
| 2 | Auto Exp | 40,434.38 | 38,413.79 | 2,020.59 | 95.0028 | 4.9972 |
| 7 | Out of Town Travel Exp | 38,180.44 | 36,278.19 | 1,908.25 | 95.0028 | 4.9972 |
| 7 | Other Exp (Schedule 3.) | 74,059.87 | 70,912.03 | 3,147.84 | 95.1749 | 4.2504 |
| | Total | 1,736,481.88 | 1,625,641.29 | 110,840.59 | 93.6169 | 6.3831 |

TATEL, Circuit Judge, concurring:

I dissented in *Abrams* because I saw nothing in *Hudson* that required its application to new employees and financial core payors. *Abrams*, 59 F.3d at 1383–84 (Tatel, J., concurring in part and dissenting in part). This case demonstrates the consequences of *Abrams*: judicial usurpation of the Board's traditional authority to determine national labor policy.

To protect employees' *Beck* rights, the Board has crafted a three-step process, calibrating the nature and amount of information that unions must give employees to

the decision they must make at each stage. New employees and financial core payors receive an initial *Beck* notice informing them of their *Beck* rights and how to exercise them. *See California Saw & Knife Works*, 320 NLRB at 233. *Beck* objectors are told the amount of the reduced dues as well as how that amount was calculated. *See id.* *Beck* objectors who challenge the union's calculation receive still more information, with the union bearing the burden of proving the accuracy of its calculation. *See id.* at 240. Balancing employees' need for information against the burden on unions of providing the information, this process reflects the Board's application of the duty of fair representation in the *Beck* context.

Consistent with this approach, the Board held in this case that unions were not required to disclose to new employees and financial core payors the percentage by which their dues would be reduced were they to exercise their *Beck* rights. Not only does the Board believe that new employees and financial core payors have no need for this information to decide whether to exercise their *Beck* rights, but it concluded that providing the information would be an "expensive and timeconsuming undertaking." *International Bhd. of Teamsters, Local 166*, 327 NLRB No. 176, slip. op. at 3. Whether to disclose the percentage is a "judgment call," within the "wide range of reasonableness" afforded unions in carrying out their duty of fair representation, the Board found. Local 166's failure to disclose the percentage was not "arbitrary, discriminatory, or in bad faith." *Id.*

Absent *Abrams*, we would evaluate the Board's reasoning pursuant to a highly deferential standard. *See Ferriso v. NLRB*, 125 F.3d 865, 869 (D.C.Cir.1997). Yet as our opinion in this case demonstrates, *Abrams'* extension of *Hudson* to new employees and financial core payors has foreclosed us from considering the Board's rationale at all, requiring that we ignore not just our traditional deference to the Board, but also the "wide range of reasonableness" afforded unions in satisfying their duty of fair representation. *See Marquez*, 119 S.Ct. at 300. "It is hard to think of a task more suitable for an administrative agency that specializes in labor relations, and less suitable for a court of general jurisdiction, than crafting the rules for translating the generalities of the *Beck* decision . . . into a workable system for determining and collecting agency fees." *International Ass'n of Machinists & Aerospace Workers v. NLRB*, 133 F.3d 1012, 1015 (7th Cir.1998). By commandeering a judgment that should have been left to the Board's expertise, *Abrams* has produced a result that I doubt *Hudson* intended.