John MASIELLO and Craig Sickler, Plaintiffs,

v.

US AIRWAYS, INC., the International Association of Machinists and Aerospace Workers, Airline Machinists District Lodge 141–M, and Local Lodge 1725, Defendants.

No. 3:99CV319–H.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 14, 2000.

Philip M. Van Hoy, Van Hoy, Reutlinger & Taylor, Charlotte, NC, Glenn M. Taubman, Springfield, VA, for plaintiffs.

Louis L. Lesesne, Jr., Lesesne & Connette, Charlotte, NC, David L. Neigus, Upper Marlboro, MD,, Jeremiah A. Collins, Robert Alexander, Bredhoff & Kaiser, PLLC, Washington, DC, for International Ass'n of Machinists & Aerospace Workers, Airline Machinists Dist. 141, Local 1725, Intern. Ass'n of Machinists and Aerospace Workers Local Lodge 1725, defendants.

Deanna Ruddock Lindquist, Kilpatrick Stockton LLP, Charlotte, NC, Chris A. Hollinger, Robert A. Siegel, O'Melveny & Myers, L.L.P., Los Angeles, CA, for USAirways, Inc., defendant.

### MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on the following motions, memoranda, and responsive pleadings:

1. "Plaintiffs' Motion for Summary Judgment" (document # 27) and "Plaintiffs' Memorandum in Support.," (document # 28), both filed July 18, 2000;

2. "Defendant U.S. Airways, Inc.'s Memorandum in Opposition..." (document # 36) and "Memorandum of Defendants International Association of Machinists ... in Opposition..." (document # 37), both filed September 1, 2000; and

3. "Plaintiffs' Reply Memorandum in Support..." (document # 38) filed September 12, 2000.

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this motion is now ripe for disposition. Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will *grant* the Plaintiffs' motion.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs John Masiello and Craig Sickler were hired by Defendant U.S. Airways, Inc. ("Employer" or "Airline" or "US Airways") in August 1988 and May 1988, respectively, to work in the craft or class of "mechanical and related personnel." Both became members of the Defendant International Association of Machinists and Aerospace Workers ("IAM" or "IAM International").

Defendant U.S. Airways is a corporation organized and existing under the laws of the State of Delaware which maintains its principal place of business in Arlington, Virginia. US Airways operates an airline in interstate commerce and is a "carrier by air" within the meaning of Section 201 of the Railway Labor Act ("RLA"), 45 U.S.C. § 181.

IAM International is an unincorporated association, with its principal offices in Maryland, existing in part to represent employees with respect to rates of pay, hours, and working conditions, and is a labor organization subject to the provisions of the Railway Labor Act, 45 U.S.C. §§ 151–88 (1982). Pursuant to RLA § 2 *Ninth,* 45 U.S.C. § 152 *Ninth,* the IAM has been certified as the exclusive bargaining representative of the craft or class of mechanical and related personnel at U.S. Airways. The IAM carries out its representational functions at U.S. Airways through the services of affiliated labor organizations, namely Defendant Airline Machinists District 141–M ("DL 141–M") and Defendant Local Lodge 1725 ("LL 1725").[1] Along with and through these affiliates, Defendant IAM serves as the exclusive bargaining representative of U.S. Airways' mechanical and related personnel at Charlotte, North Carolina, which included representation of the Plaintiffs while they were U.S. Airways employees.

In 1995, both Masiello and Sickler resigned their memberships in the IAM unions and began annually informing the IAM, in writing, that each objected to

---

**1.** Defendants DL 141–M and LL 1725 are unincorporated associations, with their principal offices in California and Charlotte, North Carolina, respectively.

supporting the nonrepresentational activities of the IAM and its affiliates. On July 8, 1996, and October 28, 1996, respectively, Masiello and Sickler each revoked the dues check-off authorization they had signed.

In the Fall of 1998 and pursuant to its own internal policy and procedures, the IAM published in the *IAM Journal* the then-current version of a "Notice to Employees Subject to Union Security Clauses" ("Notice to Employees") concerning the procedure for nonmembers to file objections and pay reduced dues. The Notice to Employees provided that nonmembers of the IAM who filed timely written objections to supporting the IAM's political and nonrepresentational agenda would pay reduced fees for the 1999 calendar year, to be calculated as "the percentage reduction in monthly Grand Lodge per capita payments ... 26.62 percent, plus a 12.71 percent reduction in district lodge per capita and an [sic] 17.83 percent reduction in local lodge fees." The Notice to Employees was not accompanied by any financial information or explanations about how the IAM or its affiliates arrived at their reduced fee calculations for the 1999 calendar year.[2]

Despite the lack of financial information, in November 1998, Plaintiffs each responded to the IAM's "Notice to Employees" by sending letters of objection. Later that month, the IAM's General Secretary–Treasurer, Donald E. Wharton ("Secretary Wharton"), wrote each Plaintiff that their objections had been properly "perfected" in accordance with the IAM's "Notice to Employees" and that they had thirty days to file a "challenge" to the IAM's reduced fee calculation before an "impartial arbitrator chosen by the American Arbitration Association ('AAA')."

Also included with Secretary Wharton's letter to each Plaintiff was a "financial disclosure package" containing single-page "fee reduction audit" summary sheets for the IAM and several of its local lodge and district lodge affiliates, most of which had nothing to do with DL 141–M or LL 1725. Certain of the information dated back to 1993, some was illegible, and whole sections and columns of information were cut off the copies received by the Plaintiffs. Significantly, the "financial disclosure package" nowhere mentioned the expenditures of Plaintiffs' local union, LL 1725, nor were any of the IAM affiliates' one page "fee reduction audits" prepared by independent certified public accountants.[3]

This "financial disclosure package," along with the earlier "Notice to Employees," was the only financial disclosure material ever sent to Plaintiffs by the Defendants prior to their discharge.

In his deposition, the IAM's Assistant Secretary–Treasurer, William Engler ("Assistant Secretary–Treasurer Engler"), conceded that a non-member objector would not be able to use the limited information provided to compute the percentage of dues used for political and other nonrepresentational purposes and thus to determine what reduction in dues was indicated.

Despite the IAM's failure to meet its disclosure obligation, the Plaintiffs both notified the IAM by letter sent in December 1998, that they "challenged" the IAM's reduced fee calculations, and requested arbitration. Both also requested an independent escrow account in which disputed fees could be deposited, and specifically asked for the financial disclosure to which they were clearly entitled. These letters were received by the IAM and accepted as timely "challenges" under the "Notice to Employees" and the IAM's internal procedures.

---

2. The IAM's policy and practices is to send additional financial disclosure information about the reduced fee calculations only after an employee files timely objections.

3. In fact, the record clearly reflects that at no time since at least 1989 have the financial books and records of LL 1725 or DL 141–M been audited by an independent certified public accountant.

At no time prior to procuring Plaintiffs' discharge (in June 1999) did the IAM send either Plaintiff a copy of the notes or supporting schedules they requested or otherwise respond to the Plaintiffs' request for financial disclosure. Nor was this deficiency a mere oversight. When asked if the IAM would ever respond to an employee who asked for additional information, such as the notes to the financial statements, Assistant Secretary–Treasurer Engler, the man in charge of the IAM's objection program, bluntly answered: "I would not respond."

At no time after their challenges were submitted (in December 1998) did Plaintiffs receive any acknowledgment from the IAM unions that their correspondence had been received; that an arbitration had been scheduled; that any additional "fee reduction audits" would be conducted; or that an escrow account for disputed fees had been established with an independent third party. Accordingly, the Plaintiffs did not pay any dues that allegedly accrued after January 1, 1999.

Rather than providing the requested financial information—as clearly required by law—beginning April 7, 1999, LL 1725 and DL 141–M compounded their error by threatening Plaintiffs' employment if they failed to pay both the arrearage *and* a "reinstatement fee." None of the demand letters from the union acknowledged the Plaintiffs' pending "challenges," responded to their requests for arbitration, reported on any "fee reduction audit," or advised that an escrow account had been established.

Still having failed to afford Plaintiffs the required procedural protections, on May 14, 1999, Defendants IAM and DL 141–M requested that U.S. Airways discharge them both, citing their "noncompliance" with Article 19 (entitled "Union Shop and Dues Check–Off Agreement") of the collective bargaining agreement. In late May 1999, the Plaintiffs appealed to U.S. Airways, noting the complete lack of procedural protections required by law. US Airways brushed aside the argument as "not germane" to the standards of the U.S. Airways–IAM collective bargaining agreement,[4] discharging the Plaintiffs on June 1, 1999. At the time of their termination, both Plaintiffs had good work records.

The record is replete with examples of the union's untimely, inadequate practices and procedures. For example, despite receiving the December 1998 letters and accepting them as valid challenges under its "Notice to Employees," the IAM did not contact the AAA to initiate arbitration until November 1999, almost one year after the challenges were received and five months *after the Plaintiffs were discharged.* Apparently such delays were not uncommon and, indeed, in other cases the delayed responses were even longer. On January 8, 1998, for example, the IAM contacted the AAA to invoke arbitration over nonmembers' challenges to *1996* fee collections.

Similarly, the IAM affiliates' "fee reduction audits" (for LL1725 and DL 141–M) were not completed until August 1999— two months *after the Plaintiffs were discharged.* Furthermore, these tardy "audits" were not really audits. Rather, they were self-serving reports prepared by union members—with high school educations and no training in accounting—whom the Secretary–Treasurer had the singular power to dub "Grand Lodge Auditors."

Mr. Jim Pichler, the "Grand Lodge Auditor" who conducted the "fee reduction audit" of LL 1725, testified that he was unfamiliar with the "standards of field

---

4. There is an "indemnification clause" in the collective bargaining agreement providing that the IAM will "indemnify [US Airways for] ... liabilities which arise out of ... any action taken [by U.S. Airways in] ... complying with ... [the collective bargaining agreement.]" US Airways concedes that the clause does not in any way absolve it of liability to the Plaintiffs. *See* "Defendant U.S. Airways, Inc.'s Memorandum in Opposition..." (document # 36) at 2.

work" applicable to audits. Nevertheless, Mr. Pichler—a high school graduate with no background in accounting—testified that "99–100%" of LL 1725's officer's salaries were properly chargeable to objecting nonmembers; that he had not even interviewed the Vice–President or Secretary prior to reaching this conclusion; and that the President and Treasurer kept no time records, but could recall how their time was allocated a year-and-a-half earlier. Nevertheless, even on this flimsy and indefensible basis, Grand Lodge Auditor Pickler determined that the dues reduction (for LL 1725) for objecting nonmembers should have been almost twice that which was allowed.

Finally, the record is clear that at no time prior to May 1, 1999 did the Defendants establish an *independent* escrow account in which the dues or fees demanded from the Plaintiffs could be deposited. The IAM has established two accounts, which it calls "escrow" accounts, but these accounts are controlled solely by IAM officers and employees. Indeed, again showing the arrogance of too much unchecked power, the record reflects that the IAM made withdrawals from these accounts whenever it believed—unilaterally—that the amounts in the "escrow" accounts were excessive.

In January 1999, for example, the IAM used the "escrow" accounts to pay certain fees and expenses after it lost a case in federal court. Although Assistant Secretary–Treasurer Engler had "no idea" who authorized this payment, he conceded that "there's no written policy which prevents the union from paying such bills or fees or costs from out of the . . . escrow account."

## II. *DISCUSSION OF CLAIMS*

### A. *The Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any mate-

rial fact and . . . the moving party is entitled to a judgment as a matter of law." *See also Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. *Id.* at 249–50, 106 S.Ct. 2505.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. *Id.* at 255, 106 S.Ct. 2505; *Miltier v. Beorn,* 896 F.2d 848 (4th Cir.1990); *Cole v. Cole,* 633 F.2d 1083 (4th Cir.1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotations omitted).

### B. *Procedural Requirements in Enforcement of Union Security Clauses*

The enforcement of a "union security agreement" under the Railway Labor Act, Section 2 *Eleventh,* 45 U.S.C. § 152 *Eleventh,* is governed not only by the RLA, but also by the United States Constitution, since it is considered to be governmental action. *See, e.g., Railway Employees' Dep't. v. Hanson,* 351 U.S. 225, 234–38, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *and Ellis v. BRAC,* 466 U.S. 435, 455–57, 104 S.Ct.

1883, 80 L.Ed.2d 428 (1984) (nonmember employees working under the RLA are entitled to constitutional safeguards to ensure that they are not forced to pay for union political and nonrepresentational activities).

■ The Supreme Court has held that "union security clauses" are not enforceable in the absence of *pre-collection* procedures which safeguard the nonmembers' rights to refrain from funding union political, ideological, and nonrepresentational activities they oppose. *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 301–303, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). *Accord Tierney v. City of Toledo,* 824 F.2d 1497, 1504 (6th Cir.1987), *further proceedings,* 917 F.2d 927 (6th Cir.1990) ("[N]o union or employer may take any action to enforce a non-union member's duty to pay any dues, whether through a deduction from wages or payment from wages already paid, until a plan with procedures meeting the commands of … *Hudson* is established and operating.")

Under *Hudson,* collection of compulsory union dues is contingent upon fair and adequate procedural protections for nonmember employees. "[B]y allowing the agency shop at all, we have already countenanced a significant infringement on [nonunion employees'] First Amendment rights." *Hudson,* 475 U.S. at 301, n. 8, 106 S.Ct. 1066 (emphasis added), *citing Ellis,* 466 U.S. at 455–56, 104 S.Ct. 1883. *Accord Hudson,* 475 U.S. at 303, n. 11, 106 S.Ct. 1066; *and Shea v. International Ass'n of Machinists,* 154 F.3d 508, 514–15 (5th Cir. 1998) (*Hudson*'s "requirement that 'the procedure be carefully tailored to minimize the infringement' [on nonunion employees' constitutional rights] is the standard by which the union shop procedures must be evaluated under the RLA").

■ In practical terms, *Hudson* imposes on unions and employers the duty to provide all objecting nonmembers with the following procedural protection:

1) pre-collection notice and audited financial disclosure which adequately explains the basis of the chargeability and the non-chargeability calculations and is made in advance of any collections, so that the employees have sufficient time prior to collections to intelligently review the financial disclosure and determine whether to object;

2) a fairly calculated "advance reduction" in the amount of the fee calculation, based upon the independently audited financial disclosure;

3) an escrow of all collections reasonably in dispute; and

4) an expeditious hearing before an impartial decisionmaker to evaluate the agency fee calculations.

*Id.* at 301–303, 106 S.Ct. 1066.

Simply stated, the right to valid, pre-collection *Hudson* procedural protections trumps any contractual claim the IAM has to collect dues under the Railway Labor Act or the U.S. Airways–IAM union security clause. *Id. Accord CWA v. Beck,* 487 U.S. 735, 745, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988); *Tavernor v. Illinois Federation of Teachers,* 226 F.3d 842 (7th Cir. 2000); *Penrod v. NLRB,* 203 F.3d 41, 45–46 (D.C.Cir.2000) (union financial disclosure inadequate where the union refuses to provide the supporting notes and schedules); *Production Workers Union, Local 707 (Mavo Leasing),* 322 N.L.R.B. 35, 1996 WL 511835 (1996), *enforced,* 161 F.3d 1047, 1053 (7th Cir.1998) (employees' discharges invalid in the absence of a valid notice, even though the employees had refused to pay any dues); *Ferriso v. NLRB,* 125 F.3d 865, 870 (D.C.Cir.1997) (*Hudson*'s mandate of "verification by an independent auditor" requires financial audits performed by independent certified public accountants for each level of the union hierarchy); *Lancaster v. ALPA,* 76 F.3d 1509, 1517 (10th Cir.1996) (summary judgment in favor of discharged employee, even though he had refused to pay any of the disputed assessment); *Weaver v. University of Cincinnati,* 942 F.2d 1039, 1045

(6th Cir.1991) (courts must issue injunctions against all agency fee collections when the *Hudson* compliance is inadequate); *Dean v. TWA* 924 F.2d 805, 809 (9th Cir.1991) (employee's discharge invalid, since a nonmember incurs "no duty to pay dues until [union] complies with *Hudson*"); *Dashiell v. Montgomery County,* 925 F.2d 750, 752 (4th Cir.1991) (same); *Lowary v. Lexington Local Board of Education,* 854 F.2d 131, 134 (6th Cir.1988) (granting injunction against all dues collections in the absence of a valid *Hudson* plan); *and Tierney,* 824 F.2d at 1504, *further proceedings,* 917 F.2d at 933–39.

## C. *The IAM Unions' Pre–Collection Procedures Were Woefully Inadequate*

### 1. *Requirements of a Pre–Collection Notice, an Audited Financial Disclosure, and a Fairly Calculated "Advance Reduction" in Dues*

■ It is self-evident from the facts set forth in Section I (Factual and Procedural Background) that the IAM failed to give the required pre-collection notice, an audited financial disclosure, or a fairly calculated "advance reduction" in dues.

At the time that the Plaintiffs were first required to object under the IAM's "Notice to Employees" (in November 1998), they were given *no* financial disclosure about the expenditures of the IAM, DL 141, or LL 1725. All they were given was the "Notice" itself, which stated that "the percentage reduction in monthly Grand Lodge per capita payments is 26.62 percent, plus a 12.71 percent reduction in district lodge per capita and an [sic] 17.83 percent reduction in local lodge fees." Not an iota of financial documentation was provided to them at that critical time, when they and other employees were required to either object or waive their rights, in direct contravention of clear law to the contrary. *See Hudson,* 475 U.S. at 305–06; 106 S.Ct. 1066 (condemning this precise practice); *and Dashiell,* 925 F.2d at 752–56 (same).

■ The "financial disclosure package," which was given to Plaintiffs *after* they objected, was hardly an improvement on no disclosure at all. As previously stated, what was provided was illegible in part; had whole columns of numbers missing; was not prepared by an independent auditor or, indeed, even by a real "dependent auditor"; and, in fact, was prepared by a high school educated, untrained "Grand Lodge Auditor" only *after the Plaintiffs were threatened and discharged.* Again, the union's practices were in direct contravention of clear law to the contrary. *See, e.g., Dashiell,* 925 F.2d at 753–54; *Ferriso v. NLRB,* 125 F.3d 865, 867–70 (D.C.Cir. 1997) (reversing NLRB ruling that "audits" by in-house union employees were adequate under *Hudson*); *and Tierney,* 824 F.2d at 1506, *further proceedings,* 917 F.2d at 935–36 ("*Hudson* require[s] that detailed financial information concerning all major categories of union expenses, including those for payments made to affiliated unions, be audited by a certified public accountant independent of the union and provided to all non-members before any fees may be collected from them").

■ The union also knowingly refused to provide the Plaintiffs with readily available notes and schedules, providing instead only single page "fee reduction audits." This, too, was in direct contravention of clearly applicable law. *See Penrod v. NLRB,* 203 F.3d 41, 43–47 (D.C.Cir.2000) (unions must adequately explain the basis of their calculations and the method used to arrive at them); *Damiano v. Matish,* 830 F.2d 1363, 1370 (6th Cir.1987) (union must provide nonmembers with "the method" of calculation); *and Dashiell,* 925 F.2d at 752–56 (same).

Finally, even given the woeful inadequacy and downright arrogance of the union's practices and procedures, the union conceded—after it repeatedly threatened and ultimately terminated the Plaintiffs—as to LL 1725, that the dues reduction for ob-

jecting nonmembers should have been almost twice that which was allowed.

## 2. *Requirement of an Escrow Account for Disputed Fees*

"Escrow"—as used by *Hudson*—requires an escrow account be established with independent, third-party control over the withdrawals. *See Romany v. Colegio de Abogados,* 742 F.2d 32, 44 (1st Cir.1984) (interim remedy is to place the disputed dues in an interest bearing escrow account "managed by a bank or other neurral entity"); *and Lehnert v. Ferris Faculty Ass'n,* 643 F.Supp. 1306, 1333 (W.D.Mich.1986) (funds must be placed in an "independently controlled" escrow account), *aff'd,* 881 F.2d 1388 (6th Cir.1989), *aff'd in part, rev'd in part,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). At no time did the Defendants establish such an account in this case.

■ The IAM's so-called "escrow account," which simply moves money from one IAM pocket to another, cannot possibly pass muster under *Hudson.* The IAM coyly claims to have more than enough money tucked away to cover any claim by objecting employees, but, even if true, such accounts do not constitute real escrow accounts. Indeed, in *Romero v. Colegio De Abogados,* 204 F.3d 291 (1st Cir.2000), the First Circuit struck down an almost identical non-escrow arrangement utilized by a state bar association, stating:

> The Colegio claims that sufficient funds exist in the escrow account to cover any disputed amounts. This argument misses the mark. Romero's complaint is that *his* dues are being used for a purpose to which he objects, and this is exactly the issue to which the Supreme Court was responding in *Hudson* when it held the disputed funds must be placed in escrow.

*Id.* at 304 (emphasis in original).

## 3. *Requirement of Expeditious Hearing Before an Impartial Decisionmaker*

■ Nor, finally, did the Defendants comply with the *Hudson* requirement that an expeditious hearing be scheduled before an impartial decisionmaker to evaluate the union's fee calculations.

It is true that an "expeditious arbitration might satisfy the requirement of a reasonably prompt decision by an impartial decisionmaker." *Hudson,* 475 U.S. at 308, n. 21, 106 S.Ct. 1066. *Accord Dashiell,* 925 F.2d at 752–54; *and Dean,* 924 F.2d at 808 ("[B]efore collecting fees through an agency shop agreement, a union must adequately explain the basis for the fee, and provide a reasonably prompt opportunity to challenge it before an impartial decisionmaker").

What occurred here, however, was the antithesis of expeditiousness. Plaintiffs filed for arbitration under the IAM's "Notice to Employees" in December 1998. The IAM stonewalled the Plaintiffs for half a year, threatened them and ultimately procured their discharge in May 1999—then waited until November 1999, *five months after their discharge,* to initiate arbitration. There is no way that the union's maddening nonfeasance could be reasonably regarded as "expeditious."

## D. *Conclusion*

There is only one conclusion a reasonable fact finder could make on this record: the Plaintiffs were systematically denied procedural protections to which they were clearly entitled. Therefore, the Plaintiffs' Motion For Summary Judgment, at least as to liability, must and shall be granted.

## III. *ORDER*

NOW, THEREFORE, IT IS ORDERED:

1. "Plaintiffs' Motion for Summary Judgment" (document # 27) is GRANTED as to the liability of all Defendants. Provided, however, the Court will address the validity of the indemnification clause in the collective bargaining agreement, if at all, at a later date.

2. Counsel for the parties shall confer, *in person,* on or before October 31, 2000, and shall diligently seek to resolve the issues remaining in this case. If the remaining issues cannot be resolved by counsel, a murually acceptable mediator and proposed dates for a mediation shall be discussed. Thereafter, *on or before November 30, 2000,* counsel shall submit to the undersigned either a Consent Judgment for signature *or* the name, address, and telephone number of a proposed mediator (or mediators) and dates when counsel are available for a mediation to be scheduled.

3. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.