# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 8, 2008　　　　　Decided April 18, 2008

No. 07-1025

DAVID PIRLOTT AND
SHERRY PIRLOTT,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with
07-1082, et al.

On Petitions for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

*Glenn M. Taubman* argued the cause and filed the briefs for petitioner Sherry Pirlott and David Pirlott.

*Frederick Perillo* argued the cause for petitioner Teamsters Local 75. With him on the briefs was *Scott D. Soldon*.

*Amy H. Ginn*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*,

Associate General Counsel, *Linda Dreeben*, Assistant General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

*Glenn M. Taubman* was on the brief for intervenors Sherry Pirlott and David Pirlott.

*Scott D. Soldon* and *Frederick Perillo* were on the brief for *amicus curiae* Teamsters Local 75.

Before: RANDOLPH and ROGERS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Sherry and David Pirlott ("Charging Parties"), employees of Schreiber Foods in Green Bay, Wisconsin, complain that their union, Teamsters Local 75 ("Union") violated its duty of fair representation under *Communications Workers of America v. Beck*, 487 U.S. 735 (1988), by spending their dues for organizing activities and failing to provide them with adequate financial disclosures. The Charging Parties filed unfair labor practice charges with the National Labor Relations Board ("NLRB" or "Board") and a complaint was issued by the Board's General Counsel. The Board found that the Union's financial disclosures were adequate, but determined that the Union had not justified its expenditures and ruled that the portion of the Charging Parties' dues spent on organizing activities must be returned to them.

The Union challenges the Board's ruling, arguing that the Board disregarded past precedent, arbitrarily failed to weigh evidence before it, and denied the Union a fair opportunity to present its case. The Charging Parties challenge the Board's decision, because it fails to state that *all* organizing expenses, not just the organizing expenses in their case, run afoul of *Beck*. We reject the Charging Parties' claim as not properly before the court. We deny the Union's petition for review and grant the

Board's cross-application for enforcement in part. In particular, we uphold the Board's determination that the Union failed to show that its organizing activities were permissible expenditures for objecting nonmembers' dues under *Beck*, and we remand the case to allow the Board to reconsider the issue of the adequacy of the Union's financial disclosure in light of *Penrod v. NLRB*, 203 F.3d 41 (D.C. Cir. 2000).

## I. BACKGROUND

Under § 8(a)(3) of the National Labor Relations Act ("NLRA"), unions have the right to negotiate union-security clauses. Under such provisions, an employer may "mak[e] an agreement with a labor organization . . . to require as a condition of employment membership therein." 29 U.S.C. § 158(a)(3). The Supreme Court has long limited the permissible scope of union-security clauses by holding that when employees object to union membership, their obligation to the union is restricted to its "financial core" – *i.e.*, objecting nonmembers can be required to pay their dues to the union but nothing more. *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 742 (1963). In *Beck*, the Court held that objecting nonmembers cannot be required "to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment." 487 U.S. at 745. Under *Beck*, if a union's activities extend beyond its role as the representative of a collective bargaining unit, the dues of objecting nonmembers must be reduced on a per capita basis for all funds spent on those additional activities.

Schreiber Foods processes cheese and other dairy products in Green Bay, Wisconsin. Since 1951, the Union has been the exclusive representative of production and maintenance employees at Schreiber Foods. During the relevant time period, the Union had several thousand members in nearly 150 bargaining units. Approximately 1,600 members were in the dairy industry, and 600 were in the food processing industry. The Union also represents employees in the public sector in

Green Bay, Wisconsin. The Union is affiliated with the International Brotherhood of Teamsters, the Central Conference of Teamsters, and the Wisconsin Joint Council 39.

At all relevant times, the Union and Schreiber Foods have been parties to a collective bargaining agreement that contains a union-security clause. The clause in the Schreiber Foods contract reads:

> All present employees who are members of the Union on the effective date of this subsection . . . shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment . . . .

*Schreiber Foods*, 329 N.L.R.B. 28, 42 (1999) (decision of the Administrative Law Judge ("ALJ")). Sherry Pirlott began working at Schreiber Foods and joined the Union in 1963. Her husband David Pirlott was hired at Schreiber Foods and joined the Union in 1973. In a joint letter dated September 20, 1989, they resigned their membership in the Union and objected to the use of their fees for any non-collective bargaining activity. The Union then informed the Charging Parties by letter that their dues would be reduced by $0.23 per month. Attached to this letter was a one-page "Schedule of Expenses and Non-Chargeable Expenses Year Ended December 31, 1988":

|  | 1988 Expense | Nonchargeable |
|---|---|---|
| Per Capita Tax | $253,202 | $6,299 |
| Salaries | 482,273 | 0 |
| Expense Allowance | 18,505 | 0 |
| Contributions | 700 | 700 |
| Benefits | 94,555 | 0 |
| Professional Fees | 9,058 | 0 |

| | | |
|---|---|---|
| Taxes | 35,721 | 0 |
| Meeting and Committee | 10,177 | 0 |
| Automobile | 10,232 | 0 |
| Out-of-Town Travel | 22,478 | 0 |
| Education & Publicity | 19,127 | 4,537 |
| Stewards | 17,235 | 0 |
| Building Maintenance | 5,511 | 0 |
| Administrative | 110,123 | 0 |
| | | |
| Total Expenses | $1,088,897 | $11,536 |
| | | |
| Percent Nonchargeable | 1.1% | |

*Id.* at 45. The Charging Parties objected, demanded that their dues be placed in an escrow account, and filed unfair labor charges against the Union with the NLRB on November 8, 1989.

The NLRB General Counsel issued a Complaint and Notice of Hearing ("Complaint") approximately two years later. In that Complaint, the General Counsel alleged, *inter alia*, that the Union charged objecting nonmembers for "expenses incurred for activities outside the bargaining unit" "contrary to the requirements of *Beck*." Complaint at ¶ 11. The General Counsel also alleged that the financial disclosures given to the Charging Parties "(i) fail[] to adequately define which expenses are considered by the Union to be nonchargeable; (ii) fail[] to break down expenditures on a unit-by-unit basis; and (iii) fail[] to provide a breakdown of the International Teamsters Union's expenditures." *Id.* at ¶ 13(b). Based on these allegations, the Complaint argues that the Union was engaged in unfair labor practices within the meaning of § 8(b)(1)(A) and (2) of the NLRA.

An ALJ held a hearing on March 5, 1992. After briefing and testimony, the ALJ first addressed the Union's financial disclosures, finding that those disclosures were inadequate. The

ALJ stated that, while "[i]t is clear that absolute precision is not required of the unions in these situations, . . . the employees must be given adequate information with which to make an informed choice as to whether he or she should dispute any of the figures." *Schreiber Foods*, 329 N.L.R.B. at 46-47. The ALJ found that the categories provided by the Union "do not provide sufficient information from which the employees can intelligently decide if the fee is proper." *Id.* at 47.

The ALJ also responded to the General Counsel and the Charging Parties' argument that, under *Beck*, organizing expenses – incurred in order to organize new workers and establish new bargaining units – should never be charged to objecting nonmembers. The ALJ found that organizing expenses were sufficiently related to collective bargaining that they could be charged to objecting nonmembers:

> [A]fter a union has negotiated an agreement with an employer, that agreement often serves as a bargaining tool, at least, at employers in the same or a similar industry, and will often cause an employer to improve his offer to the union to approach what his competitor agreed to. A union's organizational expenses should likewise be treated in somewhat the same manner. Most employers are not philanthropists willing to pay their employees whatever they want. Rather an employer will usually agree to a competitive wage that it can afford. When a union organizes other employers in the industry, and executes contracts with these employers, others in the industry can, competitively, be more flexible than if they were the only organized shop in the industry.

*Id.* at 47-48. The ALJ found, however, that the Union could not charge objecting nonmembers for organizing expenses incurred to unionize employees in the public sector, because whether or not public sector employees are unionized "probably has little or

no effect on Schreiber or the ultimate terms and conditions of employment of its employees." *Id.* at 48.

The parties appealed to the Board, which issued a decision on September 1, 1999. The Board reversed the ALJ's determination that the financial disclosures were inadequate, stating that "[t]he information provided by the Union herein was clearly sufficient to enable an objector to decide whether to challenge the Union's figures." *Id.* at 30. The Board held that "[t]he union's duty of fair representation – which requires a union to act in good faith – is met if it supplies its major categories of expenditures and supplies verified figures." *Id.*

With respect to the chargeability of organizing expenses, the Board summarized the parties' positions as follows:

> The General Counsel asserts that under *Ellis v. Railway Clerks*, 466 U.S. 435 (1984), a decision interpreting the Railway Labor Act, any expenses spent outside the relevant unit are nonchargeable. Since organizing expenses are, by definition, spent outside the relevant (already-organized) unit, they are nonchargeable (according to the General Counsel's view). The Charging Parties, inter alia, assert that the record contains no empirical evidence to suggest that organizing activity could actually benefit already-represented employees. Finally, the Union . . . noted that the judge refused to allow it any significant opportunity to present evidence demonstrating the interaction of various bargaining units represented by the Union and how such activities have a direct impact on the Union's ability to represent individual bargaining units.

*Id.* at 31. The Board decided to sever the issue of the chargeability of organizing expenses and remanded that portion of the case to the ALJ for further proceedings. *Id.* The Board described the standard as follows:

[T]he Board in *California Saw* [*& Knife Works*, 320 N.L.R.B. 224 (1995)] held that the legality of charging objectors for a particular union expense depends on "whether they are germane to the union's role in collective bargaining, contract administration, and grievance adjustment." 320 N.L.R.B. at 239. . . . As for organizing expenses, although the General Counsel . . . urge[s] a per se approach based on *Ellis*, the Board has yet to decide their chargeability to objectors. In *Connecticut Limousine Service*, 324 N.L.R.B. 633, 637 (1997), a Board majority identified several questions relevant to that determination including, for example, whether the expenditures for organizing were necessary to "preserve uniformity of labor standards in the organized workforce" as asserted by the union therein and "what kinds of employers, either in the Employer's specific industry or in competing industries, the Union might attempt to organize in order to preserve uniform labor standards."

In the absence of this defining precedent at the time that the instant dispute arose, we find it appropriate to sever these chargeability issues from this proceeding and remand them to the judge for further proceedings, including, if necessary, a reopening of the hearing to adduce additional evidence, and for the issuance of a supplemental decision containing findings of fact, conclusions of law, and a recommended Order. In deciding the chargeability of these expenses, the judge shall consider the questions deemed relevant by the Board in *Connecticut Limousine*.

*Id.* at 31-32 (footnotes omitted). One Board member dissented, arguing that there should be a *per se* rule that all organizing expenses are nonchargeable. *Id.* at 36.

After the remand order from the Board on the chargeability issue, the General Counsel moved to close the record and dismiss the remaining portions of the Complaint on the ground

that the Board had "rejected the sole theory underlying the complaint, which was that *no* nonunit expenses were chargeable to *Beck* objectors." *Schreiber Foods*, 3-CB-3077, Order at 2 (Feb. 5, 2001), *reprinted in* Br. for NLRB (Appendix). The Board rejected the General Counsel's request, finding that, while "[t]he General Counsel clearly is correct that the Board rejected the . . . contention that all nonunit expenses are *per se* not chargeable to *Beck* objectors . . . , both the judge and the Board explicitly considered a lesser theory of violation . . . , and the Board's remand directed the judge to address the chargeabilty of certain nonunit expenditures under the standard set forth in *California Saw*." *Id.* at 2-3. In its February 2001 order, the Board went on to describe the inquiry before the ALJ:

> On the current record, the General Counsel has shown that certain nonunit expenditures are being charged. The Respondent at this point has the burden of going forward to show that these expenditures are properly chargeable under the *California Saw* standard. . . . The nonunit expenses involved herein involve organizational expenses and other expenses. In regard to the former, the judge should consider the Board's decision in *Meijer, Inc.*, 329 N.L.R.B. [730] (1999), which issued after the Remand Order in the instant case. In *Meijer*, the Board held that "at least with respect to organizing within the same competitive market as the bargaining unit employer, organizing expenses are chargeable to bargaining unit employees" under the *California Saw* standard.

*Id.* at 3-4 (quoting *Meijer*, 329 N.L.R.B. at 734).

At a second hearing on October 10-11, 2001, the ALJ received testimony from three Union witnesses: Professor Dale Belman of the Michigan State University School of Labor Relations, Danny McGowan, a business agent of the Union, and Detlef Pavlovich, the Union's accountant. The Charging Parties called Irving Ross, also a certified public accountant, to retort

Pavlovich's testimony. *Schreiber Foods*, 349 N.L.R.B. No. 14, slip. op. at 23 (Jan. 26, 2007) (decision of ALJ).

Prior to hearing testimony, the ALJ described the previous decisions of the Board. In that description, the ALJ stated that "you can separate union[] activities or expenses in[to] three areas." Hearing Tr. at 234 (Oct. 10, 2001), *reprinted at* Appendix ("App.") 109. The first category included "companies that are in the same business, same industries, competitive to Schreiber Foods." *Id.* at 234-35, App. 109-10. The other categories included public sector employees and employees of private firms that were not competitive with Schreiber. *Id.* at 235, App. 110. For organizing of employees within the competitive market, the ALJ stated, "I think it's clear [from] my decision . . . and [the] Board['s] subsequent decisions that those expenses are clearly chargeable to the objectors. I don't think there's any question about that." *Id.*

On December 12, 2001, the ALJ issued a decision. The ALJ first concluded that "the Board has already decided that a union can charge objectors for expenses incurred in organizing or representing units within the same competitive market as the bargaining unit employer." *Schreiber Foods*, 349 N.L.R.B. slip. op. at 27 (quotation marks omitted). The ALJ also found that the Union's "representational and organizational expenses for employers outside of the competitive market" were chargeable. *Id.* In making this finding, the ALJ relied in large part on the testimony of Professor Belman that an increase in the number of unionized employees "in a small city such as Green Bay" would create an upward pressure on wages, regardless of the industry. For public sector employees, the ALJ reached a different conclusion, finding that increased unionization of public sector employees would have little effect on the wages of private sector employees. However, the ALJ found that the Union had not spent any of the objecting members' dues on organizing of public sector employees. *Id.* at 27-28.

The Board issued its final decision in this matter on January 26, 2007. In that decision, a majority of the Board found that the Union had not "presented sufficient evidence to support a finding, under *Meijer*, that its organizing expenses are chargeable to objectors." *Id.* at 4. The Board unanimously upheld the ALJ's determination that the Union did not charge objectors for expenses incurred in organizing public sector employees.

The Board's opinion did not interpret *Meijer* as establishing a *per se* rule on the chargeability of union expenses for organizing employees within a competitive market. Rather, the Board found that

> *Meijer* permits a union to demonstrate, as the unions did in *Meijer* for the highly competitive retail grocery business located in the same metropolitan area, that there is a direct, positive relationship between the wage levels of union-represented employees and the level of organization of employees of employers in the same competitive market. If this same showing is made under analogous factual settings, then under *Meijer* the union may lawfully charge objectors for organizing expenditures.

*Id.* at 6 (quotation marks and citations omitted). The Board found that the Union had failed to meet this standard, describing Professor Belman's testimony as "generalized academic research" that was "not specific" to the market in question. *Id.* The Board contrasted the evidence put forward by the Union in this case with the "direct, positive relationship between the wage levels of union-represented employees and the level of organization" shown in *Meijer*. *Id.* (quoting *Meijer*, 329 N.L.R.B. at 738).

In addition to the majority opinion, two panel members wrote separately. Member Schaumber dissented in part, arguing that *Meijer* should be overruled and that the Board should find

that "*as a matter of law . . .* organizing expenses are nonchargeable to objecting nonmembers." *Id.* at 12. Panel member Liebman, on the other hand, argued that *Meijer* established a *per se* rule that *all* organizing expenses within the employer's competitive market were chargeable. *Id.* at 18. Board Chairman Battista, while admitting to "grave doubts about the validity" of *Meijer*, found that it was distinguishable, and therefore concluded that, "where a case is distinguishable, there is no need to overrule it." *Id.* at 7 n.21.

Both the Union and the Charging Parties challenge the Board's ruling. Under 29 U.S.C. § 160(f):

> Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order . . . in the United States Court of Appeals for the District of Columbia, by filing in such . . . court a written petition praying that the order of the Board be modified or set aside.

## II. ANALYSIS

### A. *Standard of Review*

This court's review of NLRB decisions is deferential, and a decision of the NLRB will be overturned only if "the Board's factual findings are not supported by substantial evidence, or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Cmty. Hosp. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1082-83 (D.C. Cir. 2003) (quotation marks, brackets, and ellipses omitted). "The Board cannot 'ignore its own relevant precedent but must explain why it is not controlling.'" *Manhattan Ctr. Studios, Inc. v. NLRB*, 452 F.3d 813, 816 (D.C. Cir. 2006) (quoting *BB & L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C. Cir. 1995)). "'Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and

capricious.'"  *Id.* (quoting *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995)) (brackets omitted).

In reviewing an NLRB decision concerning the duty of fair representation, this court affords "significant" deference to the Board.  *Thomas v. NLRB*, 213 F.3d 651, 657 (D.C. Cir. 2000).

> It is hard to think of a task more suitable for an administrative agency that specializes in labor relations, and less suitable for a court of general jurisdiction, than crafting the rules for translating the generalities of the *Beck* decision into a workable system for determining and collecting agency fees.

*Id.* (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 133 F.3d 1012, 1015 (7th Cir. 1998)) (ellipses omitted).

## B.  *Matters Not Before This Court*

Before turning to the merits, it is important to understand what is not at issue in this appeal.  First, the parties agree that the Board's decision on the question of whether the Union's financial disclosures were adequate should be vacated in light of *Penrod*.  In *Penrod*, we examined a union disclosure that was similar to the one at issue in this case.  The court held that the general information provided by the union in *Penrod* was not sufficient to give objectors a basis upon which to decide whether to challenge the union's calculations.  Because *Penrod* was decided after the Board made its determination in this case that the Union's disclosures were adequate, *Penrod* did not figure into the Board's disposition of that issue.  We therefore vacate the Board's order with respect to the financial disclosures and remand to the Board to allow it to reconsider whether the Union fulfilled its obligation to provide adequate financial disclosure.

Second, neither party challenges the Board's determination that the Union did not unlawfully charge the Charging Parties for expenses incurred in organizing employees working in the

public sector. The ALJ found that "there was no net cost to the [Union] of representing . . . public-sector employees," 349 N.L.R.B. slip. op. at 28, and the Board upheld that determination. Neither party objects to the Board's decision on this question.

Finally, the Charging Parties petition this court to require the Board to adopt a *per se* rule that expenses incurred in organizing employees of other employers can *never* be charged to objectors. The Charging Parties are not "aggrieved" within the meaning of the NLRA on this issue, so their claim is not properly before this court for review.

Section 10(f) of the Act provides that "[a]ny person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order." 29 U.S.C. § 160(f). The Board in this case ordered the Union to "[c]ease and desist from . . . [c]harging and collecting from objecting nonmembers" and to "[r]efund with interest" dues and fees attributable to organizing activities. 349 N.L.R.B. slip. op. at 8. Where, as here, a judgment gives a party all the relief requested, an appeal may not be taken simply to challenge the Board's reasoning. *See Liquor Salesmen's Union Local 2 v. NLRB*, 664 F.2d 1200, 1206 (D.C. Cir. 1981) (holding that union was not aggrieved by Board decision when it "has received all the relief it requested" even if Board did not "pass specifically on [union's] motion for summary judgment").

The Charging Parties here received the specific relief that they sought and they are entitled to nothing more. It is of no moment that the Board's written rationale was not as far-reaching as the Charging Parties would have preferred. There is nothing in the Board's decision that resulted in a cognizable injury to the Charging Parties sufficient to support a showing of aggrievement under § 10(f). Nor is there any imminent threat that the Charging Parties will face the same injury that prompted

the complaint in this case. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). There is no basis for review under § 10(f).

Even assuming, *arguendo*, that the Charging Parties' disagreement with the Board's reasoning might satisfy the requirement of aggrievement under § 10(f), we would still decline their invitation to issue an advisory opinion instructing the Board to adopt a *per se* rule covering organizing expenses. It is not within the province of the judiciary to force an agency to adopt a rule on a subject that is within its compass of authority before the agency itself has acted on the issue. Under our system of judicial review, it is the role of the agency charged with administrating a statute to make the initial interpretation of that law – one that will be overturned only when the agency acts without delegated authority, or its action is at odds with the plain meaning of the authorizing statute, unreasonable, or arbitrary and capricious. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

It is also well understood that "a reviewing court must confine itself to the grounds upon which the record discloses that the agency's action was based." EDWARDS & ELLIOTT, FEDERAL STANDARDS OF REVIEW – REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 171 (2007). The Charging Parties were awarded relief because the Board found that the Union failed to show that its organizing expenses were germane to its role as bargaining agent for the employees in the Schreiber unit. The Board declined to decide anything more, apparently in part because it could not reach a consensus on the general issue of the chargeability of organizing expenses. In any event, the Board majority concluded that this question was not squarely presented and that the case could be resolved on narrower grounds. The Board also made it clear that it anticipated a future opportunity to revisit the general chargeabilty issue:

> Presumably, the General Counsel, now aided by this opinion, will understand that organizational expenses

cannot be charged unless there is a specific nexus between those expenses and the economic integrity of the unionized unit. And a union, similarly aided by this opinion, will seek to build the kind of record that existed in *Meijer* but does not exist here. Where that showing is made, we will then be squarely presented with the issue of whether organizational expenses can be charged if the nexus is shown.

*Schreiber Foods*, 349 N.L.R.B. slip op. at 7 n.21.

The general chargeabilty issue is a matter for the Board to decide in the first instance. *See, e.g.*, *Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002) ("Defining the scope of [the NLRA's] protections 'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it.'") (quoting *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984)). The Board did not decide the issue in this case, so this court is constrained to confine itself to the grounds upon which the record discloses that the agency's action was based.

**C. *The Board Did Not Act Arbitrarily in Finding That the Union's Organizing Expenses Were Not Germane to Schreiber Employees***

The Union offers several arguments that the Board acted arbitrarily in finding that the Union violated its duty of fair representation. The Union first contends that the Board ignored prior precedent, established in *Meijer*, that all organizing expenses within a competitive market are *per se* chargeable. In the alternative, the Union asserts that, even under the standard used by the Board, it presented sufficient evidence to show that its organizing efforts benefitted the employees in the Schreiber bargaining unit. Finally, the Union claims that it was denied a fair opportunity to present its case. We find none of these arguments convincing.

In *Meijer*, as in this case, several objecting nonmembers challenged the chargeability of organizing expenses. The Board held that a nonunit expense could be charged to objecting nonmembers so long as the activity is "germane to the union's role in collective-bargaining" and some benefit ultimately inures to the benefit of the employees in the unit. 329 N.L.R.B. at 733 (quoting *California Saw*, 320 N.L.R.B. at 239). Applying that standard to the facts in *Meijer*, the Board concluded:

> Having considered the evidence, the judge's decision, and the parties' arguments, we find that, at least with respect to organizing within the same competitive market as the bargaining unit employer, organizing expenses are chargeable to bargaining unit employees under the *California Saw* standard.

*Id.* at 733-34 (footnote omitted).

The Board in *Meijer* noted that it was "not finding organizing expenses chargeable in [that] case merely on a general notion that organizing makes a union stronger and a stronger union is a more successful bargainer." *Id.* at 738. Instead, the Board based its decision in *Meijer* "on academic research, empirical data, and specific evidence." *Id.* The Board cited several studies by academics in the labor economics field that found relationships between "the percent of employees organized and the level of union wages." *Id.* at 734. That relationship was confirmed in the "retail food industry" – the industry in which the employer in that case operated – by "persuasive evidence." *Id.* Finally, the Board in *Meijer* noted testimony from the president of the Union showing that the employer had "insisted on paying the mercantile clerks less than the food clerk rate because of the lower-wage, nonunion competition it faces in the mercantile industry." *Id.* at 735. From this testimony, the Board concluded that the "clerks' wages have been directly affected by the difference in the levels

of organization of [the employer's] competitors in the two industries in which it operates." *Id.*

In the instant case, the Board majority interpreted *Meijer* to mean that, in order to justify charging objecting nonmembers for organizing expenses, "the union must produce specific evidence showing a positive correlation between wages and union density in the relevant market at issue." *Schreiber Foods*, 349 N.L.R.B. slip op. at 6 n.18. The Union claims that this interpretation amounts to an arbitrary departure from the precedent in *Meijer*. We disagree.

The Board majority opinion discusses *Meijer* at length, concluding:

> *Meijer* permits a union to demonstrate, as the unions did in *Meijer* for the highly competitive retail grocery business located in the same metropolitan area, that there is a direct, positive relationship between the wage levels of union-represented employees and the level of organization of employees of employers in the same competitive market. If this same showing is made under analogous factual settings, then under *Meijer* the union may lawfully charge objectors for organizing expenditures.

*Id.* at 6 (citation and quotation marks omitted). The dissenting Board member and the Union interpret *Meijer* differently. But this disagreement does not render the majority opinion unreasonable. There is no doubt that the Board may not ignore its prior decisions, *LeMoyne-Owen College v. NLRB*, 357 F.3d 55, 60-61 (D.C. Cir. 2004), and that it must provide a reasoned justification when it departs from precedent, *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 446 (D.C. Cir. 2004). In this case, the Board did not depart from or ignore *Meijer*. Rather, the Board offered a "reasoned justification" for its interpretation and application of *Meijer*. The Board decision thus easily avoids "a finding of arbitrary and capricious action." *W & M*

*Properties of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1348 (D.C. Cir. 2008).

After finding that there was no *per se* rule, the Board turned to the evidence presented to the ALJ, and found that the Union had failed to make a persuasive case that its organizing expenses were germane to its role as the bargaining agent for the employees at Schreiber. The Board found that the testimony before the ALJ largely amounted to a "literature review that supported the general proposition[]" that organizing will "allow unions to raise wages more than they otherwise would." *Schreiber Foods*, 349 N.L.R.B. slip op. at 6. Indeed, the Union conceded that its principal witness "was not acquainted with the markets or industries relevant to the objectors' unit; nor did he have any knowledge of or acquaintance with the [Union's] organizing efforts." *Id.* The Board also found that the testimony of the Union's secretary-treasurer "was never developed beyond the purpose of the [Union's] organizing efforts to a discussion of the actual effects of those efforts." *Id.* The Board went on to say:

> Unlike the "numerous examples," *Meijer*, 329 NLRB at 735, recounted by the senior officials of the respondent unions in *Meijer*, which demonstrated the accuracy of the proposition that there was a "direct, positive relationship between the wage levels of union-represented employees and the level of organization" in *Meijer*, *id*. at 738, [none of the witnesses in this case] provided any such examples. Thus, we find that the [Union] has failed to meet its burden under *Meijer* of establishing that its organizing expenditures are germane to its duties as a bargaining representative and ultimately inure to the benefit of the objectors' bargaining unit and were not chargeable to objectors.

*Id.* The Board's findings are reasonable and supported by substantial evidence.

Finally, we reject the Union's argument that it lacked the opportunity to put evidence before the ALJ concerning the germaneness of organizing in the employer's competitive market. The Union's argument is based on the Board's supplemental order of February 2001, declining the General Counsel's request to dismiss the case. The Union argues that this order, and the ALJ's interpretation thereof, indicated that all organizing expenses in the competitive market were chargeable under *Meijer*, and that it therefore lacked notice that it was required to justify those expenditures. The Union further argues that the Board should have dismissed the Complaint after the General Counsel's theory of the case – that all organizing expenses were *per se* nonchargeable – was rejected by the Board. According to the Union, the Board's failure to dismiss the Complaint relieved the General Counsel of its burden of identifying expenses that were unlawfully charged, and placed the Union in the position of having to defend all of its nonunit expenses – an impermissibly vague inquiry.

The claim that the Union faced a completely unstructured inquiry is belied by the original remand order, which explicitly stated the issues to be addressed, including whether organizing was "necessary to preserve uniformity of labor standards" and "what kinds of employers, either in the Employer's specific industry or in competing industries, the Union might attempt to organize in order to preserve uniform labor standards." *Schreiber Foods*, 329 N.L.R.B. at 32 (quotation marks omitted). The remand order even specifically allowed for "a reopening of the hearing to adduce additional evidence." *Id.* Furthermore, in the February 2001 order, the Board explicitly pointed to *Meijer*, which clearly shows how a Union could justify its organizing expenditures. The Union's failure to present adequate evidence to the Board was not the result of the Board presenting the Union with a vague or unstructured inquiry.

The February 2001 order did not modify the Board's initial remand order – requiring the Union to justify its organizing expenditures – nor did it in any way preclude the Union from putting forward relevant evidence. The Union in fact did enter evidence at the remand hearing, over no objections from the ALJ, the General Counsel, or the Charging Parties. The Union introduced testimony from an expert witness in labor economics as well as a Union official concerning the Union's organizing activity and its effect on wages. The ALJ did not in any way preclude the Union from offering evidence on the germaneness of this type of organizing. The Board simply found that the Union's evidence did not meet the Board's standard of proof. The Union had every opportunity to build its evidentiary record before the Board arrived at this conclusion.

Because the Board did not arbitrarily depart from precedent, misconstrue the evidence before it, or deny the Union a fair hearing, we uphold the Board's order, finding that the Union unlawfully charged the Charging Parties for organizing activities, and ordering the reimbursement of the portion of their dues that were used for those activities.

## III. CONCLUSION

For the reasons indicated above, we reject the Charging Parties' claim as not properly before the court; we deny the Union's petition for review; and we grant the Board's cross-application for enforcement in part. The case is hereby remanded to allow the Board to reconsider the issue of the adequacy of the Union's financial disclosure in light of *Penrod*.