# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 9, 2012         Decided May 11, 2012

No. 10-1412

TRUMP PLAZA ASSOCIATES,
DOING BUSINESS AS TRUMP PLAZA HOTEL AND CASINO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA, AFL-CIO,
INTERVENOR

———

Consolidated with 11-1028

———

On Petition for Review and Cross-Application
for Enforcement of an Order of the National Labor
Relations Board

———

*Theodore M. Eisenberg* argued the cause for the petitioner. *Brian A. Caufield* was on brief.

*Jeffrey Burritt*, Attorney, National Labor Relations Board, argued the cause for the respondent. *John H.*

*Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Julie B. Broido*, Supervisory Attorney, and *Renée D. McKinney*, Attorney, were on brief. *Kira D. Vol*, Attorney, entered an appearance.

*Cassie Ehrenberg* and *Blair Katherine Simmons* were on brief for intervenor International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL-CIO in support of the respondent.

Before: HENDERSON, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioner Trump Plaza Hotel and Casino (Trump Plaza) seeks review of an order of the National Labor Relations Board (Board, NLRB), in which order the Board concluded that Trump Plaza violated section 8(a)(5) and (1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), (5), by refusing to bargain with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO (Union). *See Trump Plaza Assocs.*, 356 N.L.R.B. No. 53, 2010 WL 5089764 (Dec. 13, 2010). Trump Plaza concedes that it refused to bargain with the Union but claims that the Board erred in certifying the Union. The Board cross-applied for enforcement. For the reasons set forth below, we grant Trump Plaza's petition and vacate the Board's order.

## I.

In February and March 2007,[1] the Union was engaged in a city-wide campaign to represent the card dealers at several

---

[1] All dates are in 2007 unless otherwise noted.

Atlantic City casinos, including Trump Plaza. The centerpiece of the Union's strategy was to garner and publicize the support of local, state and federal government officials. On March 22, for example, the Union sent a campaign leaflet entitled "Legislators Sign-On in Support of Atlantic City Dealers" to all of Trump Plaza's full-time and part-time dealers. Employer's Ex. 2. The leaflet, which was signed by sixty New Jersey state assemblymen and senators, declared that Union representation would give the dealers a "powerful voice to negotiate for better salaries, fair benefits, and a secure retirement." *Id.* The back of the leaflet included copies of five letters from local, state and federal officials supporting the Union and unionization. The letters were also made available on the Union website through the link "Your Government and Community Support[] You, Click Here!" Employer's Ex. 4G.

On March 25, six days before the election, the Union held a rally and "mock card-check ceremony," Resp't's Br. 7, at which three public officials (United States Congressman Robert Andrews, State Senator James "Sonny" McCullough and State Assemblyman Jim Whelan) signed a document entitled "Certification of Majority Status." Employer's Ex. 3. According to the document, the officials had "conducted a confidential examination of Union authorization cards . . . . in accordance with NLRB rules" and had determined that a majority of Trump Plaza's dealers "authorized the [Union] to represent them for the purposes of collective bargaining." *Id.*[2]

---

[2] Although the record provides little detail about how the mock card-check was conducted, the Union website advised dealers that they had a right to submit authorization cards to Union representatives. Employer's Ex. 4H. According to the website, the cards would be counted in confidence and given to the Board, where they would remain until "we are certified." *Id.* ("The Company has *No Right* to know who is or is not signing cards!

Congressman Andrews led the event, which was attended by numerous Union representatives as well as a handful of public officials and at least two Trump Plaza dealers. Atlantic City's television station NBC40 reported on the rally on the eleven o'clock news. The NBC40 reporter explained that:

> Representative Robert Andrews led a bipartisan card-check authorization for Trump Plaza Casino Dealers. The results of the card-check showed certification of majority status for forming a union at Trump Plaza. This comes on the heels of last week's similar election at Caesar's Casino, when more than 80 per cent voted in favor of forming their own union as part of the UAW union . . . . State Senator Sonny McCullough, Assemblyman Jim Whelan and Reverend Reginald Floyd, joined Representative Andrews to sign the card count to confirm verification that the dealers want to join the UAW union.

Employer's Ex. 6. A poster-sized version of the "Certification of Majority Status" document was visible during the segment. *Id.* The broadcast then showed Congressman Andrews who said: "It's a very American right to bind together with your neighbors and speak up for yourself. And there are some very courageous dealers that are doing that and I support them." *Id.* The reporter ended the segment by noting, "[t]he actual vote will be held this Saturday." *Id.* Eighty-seven per cent of the voting class lived—and one hundred per cent of the voting

---

Those cards will go . . . [from] the union reps[] to the National Labor Relations Board, where they stay until we are certified."). Instead, the cards were apparently counted by the three public officials—Andrews, McCullough and Whelan—and, in any event, were not given to the Board.

class worked—in NBC40's broadcast area. *See* Employer's Ex. 8. Two newspapers also covered the rally. Pet'r's Br. 44; *see* Wayne Parry, *Dealers at Another Casino Seek Union*, Mar. 30, 2007, available at http://abclocal.go.com/wpvi/ story?section=news/local&id=5166717; Maya Rao, *Dealers at Plaza Vote Today on Union*, ATLANTIC CITY PRESS, Mar. 31, 2007.

After the rally, the Union displayed a copy of the "Certification of Majority Status" poster in its office and printed leaflet-sized photocopies, which were "made available to dealers who came into the union hall so they could read [them] and take [them]." Transcript of ALJ Hearing at 31-32, *Trump Plaza Assocs.*, No. 4-RC-21263 (NLRB May 23, 2007) ("There is a document entitled certification of majority status . . . [that] is identical to the poster that appears in the video broadcast . . . the actual poster board . . . was kept in the union hall . . . from the period approximately March 26th through the date of the election, and . . . the paper copy[] was reproduced and made available to dealers who came into the union hall so they could read it and take it."). On March 31, the Union won the election by a vote of 324 to 149, with one challenged ballot.

While the Union had won the hand, Trump Plaza did not fold. Instead, it filed objections with the Board challenging the Union's election. Specifically, it alleged that the Union "explicitly and implicitly" misled voters to believe that the government—including the NLRB—"endorsed and supported the Union in the election, . . . undermining governmental (and NLRB) neutrality." Employer's Objections to Election at 1, *Trump Plaza Assocs.*, No. 4-RC-21263 (NLRB Apr. 9, 2007). It further accused the Union of "[a]cting in concert with representatives of the federal government in 'certifying' the Union's majority status 'in accordance with NLRB rules,' through a sham card[-]check" to give the false impression that

"the Union was the certified representative of the dealers before an election was conducted." *Id.*

After a one-day hearing, an administrative law judge (ALJ) recommended that the Board reject Trump Plaza's objections and certify the Union as the dealers' exclusive bargaining agent. *See Trump Plaza Assocs.*, 352 N.L.R.B. 628, 633-34 (2008). And, on May 30, 2008, a two-member panel of the Board did just that, albeit for somewhat different reasons from those relied on by the ALJ. *See id.* at 629-30. Thereafter, the Board General Counsel issued a complaint alleging that Trump Plaza had violated section 8(a)(5) and (1) of the NLRA in refusing to bargain with the Union. *See* 29 U.S.C. § 158(a)(1), (5). In its answer, Trump Plaza admitted its refusal to bargain but challenged the Union's certification. On August 29, 2008, the two-member Board again rejected Trump Plaza's attempt to set aside the election. *Trump Plaza Assocs.*, 352 N.L.R.B. No. 146, 2008 WL 4056280 (Aug. 29, 2008). Trump Plaza then petitioned this Court for review, challenging, *inter alia*, the two-member Board's capacity to act. We held the case in abeyance pending the United States Supreme Court's decision in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 488 (2009). The High Court ultimately held that the two-member Board lacked the authority to act, *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2645 (2010); we then vacated the Board's decision and "remanded for further proceedings before the Board." *Trump Plaza Assocs. v. NLRB*, Nos. 08–1304, 08–1340, 2010 WL 4227407 (D.C. Cir. Sept. 20, 2010).

On September 29, 2010, the Board upheld the certification of the Union for the reasons stated in the May 30, 2008 order. *See Trump Plaza Assocs.*, 355 N.L.R.B. No. 202, 2010 WL 3813239 (Sept. 29, 2010). Specifically, the Board found that "reasonable voters would not have concluded that the letters and resolutions [from government officials], either

individually or in the aggregate, reflected the Board's endorsement of the Union or otherwise raised doubts about the Board's neutrality." *Trump Plaza Assocs*. 352 N.L.R.B. at 629. It further found that the mock "card-check 'Certification' . . . [did] not justify setting aside the election, given the absence of evidence that more than a few voters were aware of the 'Certification' and the wide margin of the Union's victory." *Id.* The Board then reaffirmed that, by "refusing to recognize and bargain with the Union as the exclusive collective-bargaining representative of the unit employees, [Trump Plaza] ha[d] engaged in unfair labor practices." *Trump Plaza Assocs.*, 356 N.L.R.B. No. 53, 2010 WL 5089764 (Dec. 13, 2010).

Trump Plaza timely petitioned for review.

## II.

Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." *See* 29 U.S.C. § 158(a)(5).[3] Trump Plaza does not dispute that it refused to bargain with the Union but instead challenges the Board's certification of the Union. *See U-Haul Co. of Nev. v. NLRB*, 490 F.3d 957, 960-61 (D.C. Cir. 2007). "[Our] review of NLRB decisions is deferential." *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008). We vacate a Board order "if the Board's factual findings are not supported by substantial evidence[] or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Id.* (quotation marks and citation omitted). "On questions regarding representation, we accord the Board an especially wide degree of discretion," *Canadian Am. Oil Co. v. NLRB*,

---

[3]   "A violation of [s]ection 8(a)(5) is also a violation of [s]ection 8(a)(1) . . . ." *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1356 n.6 (D.C. Cir. 2008).

82 F.3d 469, 473 (D.C. Cir. 1996) (quotation marks and citation omitted), "as Congress has charged the Board, a special and expert body, with the duty of judging the tendency of electoral flaws to distort the employees' ability to make a free choice," *C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 885 (D.C. Cir. 1988) (quotation marks and citation omitted). That said, the Board cannot "ignore its own relevant precedent but must explain why it is not controlling." *B B & L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C. Cir. 1995). "Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Pirlott*, 522 F.3d at 432 (quotation marks and citation omitted).

### *A. Government Endorsement*

Trump Plaza first argues that the Union—acting in concert with numerous government officials—sought to make voters believe that the NLRB (and the government generally) supported the Union and viewed unionization as a governmental objective. Trump Plaza points to the Union's distribution of the five letters from local, state and federal officials supporting the Union and unionization in general, which letters were included in the Union campaign leaflet mailed to the employees on March 22 and made available on the Union website. It also highlights repeated statements made in Union mailings and on its website that the "Government" and "Legislators" supported the Union's campaign. *See, e.g.*, Employer's Ex. 4A ("These are letters from our Government in Support of Exercising our Rights Under State and Federal Laws!"); Employer's Ex. 2 ("Legislators Sign-On in Support of Atlantic City Dealers"). The Board maintains that, while the Union used governmental support as a central component of its campaign strategy, no reasonable voter would misinterpret the various letters and

statements to suggest that *the Board itself* endorsed the Union. Resp't's Br. 17.

A public official's involvement in an election campaign is not by itself objectionable. *Affiliated Computer Servs., Inc.*, 355 N.L.R.B. No. 163, 2010 WL 3446126, at *2 (Aug. 27, 2010). "[P]ublic officials . . . , like other third parties, are not required to remain neutral and may properly seek to persuade employees." *Id.* The Board will set aside a representation election because of a public official's endorsement only if the endorsement (1) "create[s] a general atmosphere of fear and reprisal rendering a free election impossible," *Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 265 (D.C. Cir. 1998) (quotation marks and citation omitted), or (2) reasonably suggests that the Board itself endorses a particular outcome, *see Ursery Cos.*, 311 N.L.R.B. 399, 399 (1993) ("[N]o participant in a Board election may . . . suggest either directly or indirectly that *this Government Agency* endorses a particular choice in an election." (emphasis in original)).

The letters distributed by the Union here are plainly the opinions of the various officials who wrote them. Congressman Andrews's letter, for example, recounts his personal experience working with the Union: "I have had the privilege of working closely with the [Union] and . . . think very highly of them and what they represent. I am confident that the [Union] will continue to zealously represent its members to protect their rights." Employer's Ex. 4D. Although some of the letters suggest that the "Government" supported the Union's campaign, *e.g.*, Employer's Ex. 4C ("Government's advocacy for casino workers has been very successful, securing a stable workforce for casinos while protecting employees' rights . . . ."), nothing suggests that the officials' statements intended to speak for or otherwise indicate that the Board itself supported unionization.

For this reason, Trump Plaza's reliance on *Columbia Tanning Corp.*, 238 N.L.R.B. 899 (1978), is misplaced. In *Columbia Tanning*, a letter endorsing unionization was written in Greek on stationary with the Massachusetts Department of Labor letterhead and mailed to a group of twenty-six Greek employees, about half of whom did not speak English. *Id.* at 899. The next day, the union narrowly won the election. When Columbia Tanning challenged the election, the Board determined that, because the laborers were "recent immigrants who in all likelihood were not familiar with the complexities of state and Federal jurisdiction over labor relations," the letter created a "potential for confusion" that threatened the "*Board's* appearance of impartiality" and "thereby interfere[d] with the exercise of a free choice in the election." *Id.* at 900 (emphasis added). Given the union's narrow margin of victory and the special circumstances, the Board set aside the election. *Id.*

Since *Columbia Tanning*, however, the Board has repeatedly upheld union elections where a public official supported a particular election outcome but nothing in the record suggested that the voters could have reasonably believed the Board itself endorsed that outcome. *See, e.g.*, *Chipman Union, Inc.*, 316 N.L.R.B. 107, 107-08 (1995) ("[T]he Employer [here] has not referred to any potential evidence which would show that its employees could not discern the difference between statements about labor relations by an individual member of Congress and statements by the Board and its representative."). Unlike the Greek immigrants in *Columbia Tanning* who "could not be expected to discern readily the difference between [a letter from] the state 'Department of Labor' and the Federal 'National Labor Relations Board,' particularly in light of the fact that both contain the word 'Labor' in their titles," 238 N.L.R.B. at 900, nothing in the record suggests that Trump Plaza dealers were similarly susceptible to confusion. *See also Huntsville Mfg.*

*Co.*, 240 N.L.R.B. 1220, 1223 (1979) ("Our concern [after *Columbia Tanning*] is . . . with how closely a document mimics a *Board* publication—an[d] under what circumstances it can be said that employees might be susceptible to such mimicry." (emphasis added)); *Ursery Cos.*, 311 N.L.R.B. at 399 n.2 ("[E]mployees are not so politically naïve that they would be unable to distinguish between a Connecticut State Representative and the NLRB . . . ."). Accordingly, we believe that the Trump Plaza dealers could not reasonably have read the leaflet or website to suggest that the Board endorsed unionization.

### B.  Mock Card-Check

Trump Plaza also challenges the mock card-check rally and its corresponding certification document. The ALJ recommended overruling the objection on the ground that "it was clear to any reasonable viewer that the card[-]check certification was not the equivalent of a Board election and that neither the Board nor the federal government favored the Union's victory in the actual Board election." *Trump Plaza Assocs.*, 352 N.L.R.B. at 634. The Board, however, dismissed Trump Plaza's challenge on a different ground. It held that "[i]n the absence of evidence establishing that the Certification was widely disseminated among the unit employees, and given the Union's substantial margin of victory . . . , the record does not permit a reasonable inference that the document could have influenced enough employees to affect the results of the election." *Id.* at 630. Trump Plaza argues that, in so holding, the Board departed from its precedent and, without explanation, set a new standard for establishing dissemination. The Board meets this argument at the threshold, claiming that section 10(e) of the NLRA, 29 U.S.C. § 160(e), bars our review. Specifically, it argues that Trump Plaza was obligated to move for reconsideration

challenging the Board's different basis for its decision in order to preserve the issue for our review.

### 1. Waiver *Vel Non*

Under section 10(e) of the NLRA, "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). The provision promotes the "salutary policy . . . of affording the Board opportunity to consider on the merits questions to be urged upon review of its order." *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 256 (1943). "Cases interpreting section 10(e) look to whether a party's exceptions are sufficiently specific to apprise the Board that an issue might be pursued on appeal." *Consol. Freightways v. NLRB*, 669 F.2d 790, 793 (D.C. Cir. 1981). "While we have not required that the ground for the exception be stated explicitly in the written exceptions filed with the Board, we have required, at a minimum, that the ground for the exception be evident by the context in which the exception is raised." *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 417 (D.C. Cir. 1996) (brackets, quotation marks and citation omitted). "In each case, the critical inquiry is whether the objections made before the Board were adequate to put the Board on notice that the issue *might* be pursued on appeal." *Consol. Freightways*, 669 F.2d at 794 (emphasis added).

Although Trump Plaza did not move for reconsideration—raising a specific challenge to the Board's alleged departure from precedent—it did emphasize the scope of the mock card-check's dissemination in excepting to the ALJ's decision. *See, e.g.*, Employer's Exceptions to the ALJ's Decision at 2, 3-4, *Trump Plaza Assocs.*, No. 4-RC-21263 (July 12, 2007) (Trump Plaza "takes exception" to "[t]he ALJ's finding that the airing of a television news program, six

days before the election, throughout the viewing area where 87% of the voters lived and 100% worked, . . . did not reasonably tend to mislead voters as to the impartiality of the Board and/or Government."); Employer's Br. in Support of Its Exceptions to ALJ's Decision at 22, *Trump Plaza Assocs.*, No. 4-RC-21263 (July 12, 2007) ("[T]he certification message was distributed throughout the voting community . . . ."); *id.* at 28 n.19 ("The misrepresentation of governmental certification was disseminated first via two Trump dealers who attended the certification rally; second by television broadcast . . . ; and, third . . . by handouts to dealers who came to the hall . . . ."). The Union also argued the dissemination issue. *See* Union's Br. in Answer to Trump Plaza's Exceptions to the ALJ's Decision at 18 n.13, *Trump Plaza Assocs.*, No. 4-RC-21263 (July 23, 2007) ("[N]o evidence was introduced as to the general viewership ratings for the particular broadcast nor was there any evidence that any voter actually saw the broadcast."); *id.* at 17 n.12 ("[O]nly two Trump dealers attended this event.").

We believe Trump Plaza's objections "were adequate to put the Board on notice" that the Board's treatment of the dissemination issue inexplicably departed from precedent. Its failure to seek reconsideration, then, is not fatal to its petition for review. Trump Plaza's argument that the mock card-check was adequately disseminated to affect the election necessarily includes the argument that it was adequately disseminated under Board precedent. *See BPH & Co. v. NLRB*, 333 F.3d 213, 219 (D.C. Cir. 2003) ("[D]espite the fact that the Company's attack on the Board's new application [of its precedent] is made for the first time before us, the Board was sufficiently apprised, for the purpose of section 10(e), of the critical issue—whether the Board's [unfair labor practice] findings are supported by substantial evidence."). Raising the issue by seeking Board reconsideration would have been an

"empty formality." *Local 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 727 F.2d 1184, 1192 (D.C. Cir. 1984).

## 2. Merits

Satisfied with our jurisdiction to review the mock card-check challenge, we turn to the merits thereof. First, the Board was plainly wrong to conclude that there was an "absence of evidence" of dissemination. *Trump Plaza Assocs*., 352 N.L.R.B. at 630. It is undisputed that (1) at least two Trump Plaza dealers attended the mock-certification rally; (2) the rally was covered by NBC40 on its 11 o'clock news that evening; (3) eighty-seven per cent of Trump Plaza dealers resided, and one hundred per cent of them worked, in the station's broadcast area; (4) the certification poster was displayed in the Union hall for six days before the election; (5) copies of the certification were available for distribution in the Union hall; and (6) two local newspapers published stories of the certification rally. Given the substantial media coverage of the event, it blinks reality to say that Trump Plaza failed to provide "evidence establishing that the Certification was widely disseminated among the unit employees." *Id*. This statement suggests that the Board requires *direct* evidence of dissemination. But nothing in our case law or in Board precedent supports such a requirement. *See, e.g.*, *Crown Bolt, Inc.*, 343 N.L.R.B. 776, 779 (2004) ("Where proof of dissemination of coercive statements . . . is required, the objecting party will have the burden of proving it and its impact on the election by direct *and* circumstantial evidence." (emphasis added)). Indeed, a direct-evidence requirement could unfairly burden the party challenging the election, obligating it to poll each member of the voting class—or at least a sufficient number to affect the election—to determine whether they were aware of the challenged conduct.

In evaluating the adequacy of dissemination, moreover, the Board looks to the gravity and severity of the conduct. In basing its decision solely on lack of dissemination and margin of victory without considering the nature of the challenged conduct, the Board put the cart before the horse. *See id.* ("[T]he severity of a threat is one factor, among several, to be considered in deciding whether to set aside an election."); *see also Caron Int'l, Inc.*, 246 N.L.R.B. 1120, 1120 (1979) (factors Board considers in resolving whether misconduct affected results of election include number of violations, severity, extent of dissemination and size of unit). In *Archer Services, Inc.*, 298 N.L.R.B. 312 (1990), for example, the Board relied largely on circumstantial evidence of dissemination and the severity of the challenged conduct to set aside an election with a substantial voting margin (382 to 41). *Archer Services* involved a union challenge to an election on grounds similar to those at issue here. The union alleged the employer distributed a document—an altered NLRB ballot—that impugned the Board's impartiality. The Board determined that "employees could reasonably believe that the document came from the Board or that the Board favored the [e]mployer," and, given the employer's stipulation that it distributed the altered ballot during the campaign, the Board adopted the ALJ's recommendation to set aside the election— "notwithstanding the large size of the unit and the decisive outcome of the vote" and the fact that only two voters admitted to having seen the altered ballot. *Id.* at 314.

Similarly, in *Mount Carmel Medical Center*, 306 N.L.R.B. 1060 (1992), the Board set aside a lopsided election (185 to 77) because the employer had posted a "forged" document in the workplace. *Id.* at 1060 n.2. The Board explained that "[c]ontrary to the Employer's assertion that few employees saw the document in question," it was "distributed to [non-voting] managers, . . . posted by the Employer's basement timeclock, on the bulletin board of its

fourth floor medical department, and on restroom doors." *Id.* Thus, the Board held the hearing officer was "justified in drawing an inference that the [] document was widely disseminated and therefore could have affected the election outcome." *Id.*

It escapes us how the evidence of dissemination here is weaker than in *Archer Services* or *Mount Carmel Medical*. In both of those cases, the Board, relying largely on the gravity of the challenged conduct and circumstantial evidence of dissemination, set aside the election. And it did so despite wide voting margins. Here, however, the Board ignored the substantial circumstantial evidence of dissemination and relied almost entirely on the "wide margin of the Union's victory" (324 to 149), which was no larger than the margin of victory in *Archer Services* (382 to 41) or *Mount Carmel Medical* (185 to 77). *See Trump Plaza Assocs.*, 352 N.L.R.B. at 629-30. The Board has given no "reasoned explanation" for its departure from this precedent. *Pirlott*, 522 F.3d at 432.

For the foregoing reasons, we grant Trump Plaza's petition, vacate the Board's order and remand to the Board to, first, assess the severity of the challenged conduct—*to wit*, Trump Plaza's contention that the mock card-check constituted "a fundamental breach of Board neutrality,"[4] Pet'r's Br. 17, which misled voters to believe the election was a "foregone conclusion," *id.* at 33—and second, to reassess the extent of the mock card-check dissemination under its precedent.

*So ordered.*

---

[4] In this regard, we note the "Certification of Majority Status" recited that Andrews's, McCullough's and Whelan's examination of Union authorization cards was conducted "in accordance with NLRB rules," Employer's Ex. 3, suggesting the Board could have had a role therein.